**HELLENIC LINES LIMITED, respondent and claimant of THE S.S. ANGHYRA, her engines, boilers, etc., and The West of England Steam Ship Owners Protection & Indemnity Association, Limited, Appellants,**

v.

**BROWN & WILLIAMSON TOBACCO CORPORATION, Libellant, Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company, The American Tobacco Company and A. Fantis, Intervening Libellants, Appellees.**

No. 7931.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 4, 1959.

Decided March 23, 1960.

James E. Freehill, New York City (Seawell, McCoy, Winston & Dàlton, Jett, Sykes & Coupland, Norfolk, Va., Hill, Betts & Nash, Francis P. Kelly, New York City, Leon T. Seawell and R. Arthur Jett, Norfolk, Va., on the brief), for appellants.

John W. R. Zisgen, New York City (Edward S. Ferebee, and Bigham, Englar, Jones & Houston, New York City, on the brief), for appellees American Tobacco Co., R. J. Reynolds Tobacco Co. Liggett & Myers Tobacco Co. and A. Fantis.

Stuart Sprague (Baird, Crenshaw & Lanning, Norfolk, Va., Sprague & Peck, New York City, and Francis N. Crenshaw, Norfolk, Va., on the brief), for appellee Brown & Williamson Tobacco Corp.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and R. DORSEY WATKINS, District Judge.

HAYNSWORTH, Circuit Judge.

The principal question is responsibility for heat damage to a cargo of tobacco shipped in 1940–1941 from Bulgarian, Turkish and Grecian ports via the Suez Canal and the Red Sea around the Cape of Good Hope to Newport News and Norfolk. The District Court placed responsibility upon the ship because of failure to operate ventilating fans during hours of darkness while the ship was at anchor, under black out regulations, at Port Said, the Grand Lake, Suez and Port Sudan.[1]

We are of the opinion that the failure to operate the fans, under the circumstances, was not a fault for which the ship is responsible. We do not consider, therefore, the several preliminary questions which occupied the attention of the District Court.

Aromatic, or "Turkish," tobacco, grown in Turkey, Bulgaria and Greece normally moves to the United States in the winter months via Gibraltar. In the fall of 1940 that route was closed to Greek shipping. Germany had completed her conquest of Norway, Denmark, Belgium, The Netherlands and France, and was firmly in control of the midcontinent and in possession of bases on the Mediterranean Sea. On October 28, her ally, Italy, invaded Greece, and effectively closed the short, cool route via Gibraltar to Greek vessels.

In December, 1940, the Greek vessel, S.S. Anghyra, was moored at Thessaloniki (Salonica). She had been requisitioned as a troop carrier. At the behest of representatives of two American tobacco companies, she was released for the purpose of a voyage to the United State laden, principally, with tobacco and returning with war material. Most

1. Brown & Williamson Tobacco Corp. v. The S.S. Anghyra, D.C.E.D.Va., 157 F.Supp. 737.

of her resulting cargo of tobacco out-turned sound after a long, hot voyage around the Cape of Good Hope, the only route available or in contemplation, but some of the tobacco was entirely carbonized, and some partially damaged, by heat which had formed in pockets in each deep hold.[2]

American tobacco companies were substantially interested in 1939 crop "Turkish" tobacco stored in warehouses in Greece, Turkey and Bulgaria. Turkish tobacco, purchased by American tobacco companies, usually moved to the United States in the second winter after its harvest. Such tobacco, after its initial curing and its first summer's fermentation, with proper care, had its moisture content reduced to a level which permitted its safe transport to the United States during the cool months of the second winter via Gibraltar. The development of the war forced them to attempt shipment of cargoes susceptible to self-heating in hot weather, via Suez, twice crossing the equator.[3]

After loading tobacco in Thessaloniki, Burgas, Istanbul, Kavalla, and Piraeus, the Anghyra sailed from Piraeus on January 14, 1941. She was in convoy under the control of the British Admiralty. She arrived at Port Said on the 18th and remained there, awaiting a convoy, until the 28th.

On January 20th, after the second night at Port Said, the Anghyra's captain was summoned by the British Admiralty. He was told that a light had been seen aboard his vessel the night before and that it was not to occur again. Air attacks were being mounted against targets in the area, and the British naval officers regarded the showing of a light with such concern they told the captain that British batteries would open fire on his ship if another light was seen aboard her. They suggested that he shut down his dynamos. The captain testified he explained the need to ventilate the cargo by using the ventilating fans, but he was told "cut off this dynamo and be quiet about this and avoid trouble," for the next time a light was shown he would be shelled.

The captain returned to his ship at 7:00 o'clock that evening. He ordered the dynamos to be stopped off. Thereafter, the dynamos were shut down, during the black out hours, 5:00 o'clock P.M. to 7:00 o'clock A.M., each night when the Anghyra was at anchor in a black out port. These included Port Said, the Grand Lake, Suez, Port Sudan and Mombasa. Altogether, the dynamos were shut down for 196 hours, and 168 of them accumulated on successive nights.

The Anghyra had served the citrus fruit trade. She was equipped with

---

2. No heat pockets developed in the 'tween decks. One shipment of Bulgarian tobacco stowed in No. 3 'tween deck aft outturned soft and moldly. It is claimed that this condition was the result of excessive heat. All other tobacco stowed in 'tween decks spaces, none of it being Bulgarian, outturned sound.

3. After harvest, the planters of Turkish tobacco in Turkey, Greece and Bulgaria, string the leaves on poles and dry them in the sun. They are then packed in "village" bales and moved to warehouses. After some months, these bales are opened and the leaves processed to remove dust and foreign matter. The leaves are then rebaled.

During the next season of hot weather, the bales are stored in warehouses, well-ventilated, where they are turned and, if required, opened, to dissipate the heat they naturally generate as hot weather, over an extended period of time, causes fermentation.

In their second, even their third, exposure to extended summer's heat and humidity, such bales of tobacco will ferment again, and fermenting, will generate heat. The generated heat may be so intense that it results in spontaneous combustion. This actually occurred in two other cargoes of tobacco moving via Suez. See American Tobacco Co. v. The Katingo Hadjipatera, D.C.S.D.N.Y., 81 F. Supp. 438, modified and affirmed 2 Cir., 194 F.2d 449; American Tobacco Co. v. Goulandris, D.C.S.D.N.Y., 173 F.Supp. 140.

In normal practice, bales of tobacco, exposed to a second season of heat, are regularly inspected and turned so that heat generated on the bottom side may be dissipated, and if, necessary, the bales are broken open and aerated.

forced draft ventilation for each of her deep holds and 'tween decks spaces. Two ventilators to each space were equipped with electric fans, the pitch of the blades of one being in contrast to the pitch of the blades of the other. Thus, one ventilator to each space served as an intractor of fresh air while the other was an extractor of stale air. (No. 2 hold had two intractor ventilators and one extractor ventilator.)

The ship now asserts that operation of the ventilating fans could not have helped the situation, or, at least, that there is no evidence that failure to keep the fans operating during the nighttime while at anchor in black out ports damaged the cargo. An agent of the owners, however, had instructed the captain to keep the fans in continuous operation and he believed their constant use was desirable, if not necessary, to guard against the propensity of the tobacco to self-heat. The District Court found that this nighttime interruption of the operation of the fans "at least planted the seeds of damage" to the cargo. Since we conclude that the interruption was not a fault for which the ship is responsible, we may accept the finding without examination of the premises upon which it was based or the conclusions to which it led. It suffices to say that the District Court found no fault with the ship with respect to the major cargo, except that, when ordered by the British Admiralty to shut down the dynamos, which supplied power to the fans, during the nighttime in black out ports, the ship obeyed.

Cargo strenuously argues that the ship was not ordered formally to shut down the dynamos. It was only told that if a light was shown again, it would be sunk by British gunfire. The captain did say he was not ordered to shut down the dynamos, but that the naval officers pointed to that as the means of compliance with

the orders that no light be shown. He testified that even "suggestions" from the men with the guns were received as orders.[4]

It is suggested that the captain could have removed all of the light bulbs. The captain testified he thought of doing that, but rejected it. Aside from the uncertainty that every light bulb aboard ship could be secured each night and placed beyond reach, the ship was required to be in readiness to get under way at all times. Such a state of readiness would not exist if all of the light bulbs were removed. Furthermore, two policemen aboard to guard against sabotage reminded the captain of the need of available lights if the ship was called upon to participate in rescue operations following an air raid.

Next, it is said that the captain could have shut off the lights in the forecastle by pulling one of the switches on the electric control panel and this would have cut off the power to only one of the ventilating fans. This procedure, however, would have left the current on in the crew's quarters aft, occupied by the engine-room personnel, the donkeyman, the steward and apprentices, in the officers' quarters and in working spaces. There was as much reason to cut off the power to the crew's quarters aft as to those forward.

Before sailing from Piraeus, more than half of the ship's crew was conscripted into the Greek army. The captain was forced to accept replacements from the labor pool. Most of his crew was thus new and not of his selection.

One member of the crew intentionally, or inadvertently, had permitted a light to be shown. The captain had been told forcefully to take steps to assure that a member of his crew did not again open a door inadvertently, or inadvertently leave a light on behind him when opening a door. The naval officers had not tem-

4. Naval officers responsible for the safety of ships, crews, shore installations and shipping facilities, under actual attack in time of war, may seem indifferent to possible damage to a cargo of tobacco. Perhaps they were, but when the choice is between avoidance of speculative damage to a nonessential cargo and risk of destruction of ships, crews, installations and facilities vital to the war effort, the military preference is understandable.

porized with him. Threatened with destruction of his ship and crew, it was no time for him to temporize with his crew or his cargo.

We think the orders of the British Admiralty required him to take steps which would assure certain compliance, not probable compliance, with the black out regulations. Certainty could be achieved only by cutting off the dynamos. That is what the Admiralty suggested, and under the circumstances, the captain not unreasonably took the suggestion as an order.[5]

The captain's action did not deprive the cargo of ventilation during the night hours in black out ports. It reduced the amount of ventilation when power to the fans was cut off, but air could still move through the ventilators. In an effort to compensate for the reduction of the amount of ventilation, the weather deck hatches were opened each night when the power was off. This may not have been the equivalent of forced draft ventilation, but it shows that the captain was doing what he could to protect the cargo while complying with orders he was bound to obey.[6]

If now in the peace of a quiet chamber, fault might be found with the captain's decision, made when protection from recurrent air raids and imminent gunfire was of primary importance, the fault is one of management of the ship, for which neither the ship nor her owner is responsible under the Carriage of Goods by Sea Act.[7] Section 4(2) (a) exonerates the ship and her owners for damage caused by the neglect of the master in the navigation or in the management of the ship.[8]

Section 1304(2) (a) has no application unless the fault results in some damage

---

5. Our statement of the facts is taken, largely, from the findings of the District Court. We differ with him only as to the ultimate inference to be drawn from the evidentiary facts; that is, whether, under the circumstances, the "suggestion" of the Admiralty was an order with which the captain reasonably felt compelled to comply. It is appropriate to observe, however, that the evidence about the incident is in depositions, and that the scope of review of findings of fact is not as narrow as it would be if the District Court had seen and heard the witnesses. The Ambridge (United States v. Williams S.S. Co.), 4 Cir., 42 F.2d 971; The Sappho, 4 Cir., 94 F. 545; Coyle Lines v. United States, 5 Cir., 195 F.2d 737; Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687; The W. W. Bruce (Weyerhauser Timber Co. v. Continental S.S. Co.), 2 Cir., 94 F.2d 834; The Kalfarli, 2 Cir., 277 F. 391.

6. Generally, the temperatures in Port Said and Suez were not extreme. During the Anghyra's stay the average daily maximum was 71 degrees, Fahrenheit; the average minimum, in the fifties. Temperatures were higher at Port Sudan, Mombasa and Durban, but the fans were operating when the ship, at sea and in other ports, encountered higher temperatures of longer duration than those experienced in the black out ports. Daily maximum and minimum temperatures,

Fahrenheit, in the black out ports during the Anghyra's stay were:

| Port | Date | Maximum | Minimum |
| --- | --- | --- | --- |
| Port Said | 1/18 | 69.8° | 59.0° |
| Port Said | 1/19 | 66.2° | 50.0° |
| Port Said | 1/20 | 68.0° | 50.0° |
| Port Said | 1/21 | 69.8° | 51 8° |
| Port Said | 1/22 | 69.8° | 57.2° |
| Port Said | 1/23 | 71.6° | 59.0° |
| Port Said | 1/24 | 69.8° | 50.0° |
| Port Said | 1/25 | 73.4° | 50.0° |
| Port Said | 1/26 | 77.0° | 53.6° |
| Port Said | 1/27 | 80.6° | 55.4° |
| Port Said | 1/28 | —— | 59.0° |
| Suez | 1/29 | —— | 51.8° |
| Suez | 1/30 | 66.2° | 42.8° |
| Suez | 1/31 | 69 8° | 42.8° |
| Suez | 2/1 | —— | 46.4° |
| Port Sudan | 2/5 | —— | 73.4° |
| Port Sudan | 2/6 | 86.0° | —— |
| Port Sudan | 2/7 | 87.8° | 71.6° |
| Port Sudan | 2/8 | 84.2° | 75 2° |
| Port Sudan | 2/9 | 86.0° | 73.4° |
| Port Sudan | 2/10 | 78.8° | 66.2° |
| Port Sudan | 2/11 | 78.8° | 66.2° |
| Port Sudan | 2/12 | —— | 62.6° |
| Mombasa | 2/27 | —— | —— |
| Mombasa | 2/28 | 92.0° | 74.5° |
| Durban | 3/10 | 83.9° | 70.6° |
| Durban | 3/11 | 80.3° | 69.5° |

7. 46 U.S.C.A. § 1300 et seq.

8. 46 U.S.C.A. § 1304(2) (a) provides:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."

to cargo. That some damage to cargo does result does not establish the character of the fault or show that it was a failure to properly care for cargo within the meaning of § 1303. We must look, not to the fact that cargo was damaged, but to the nature and purpose of the act which caused the damage.

Under the earlier Harter Act[9] and COGSA, the ship's liability turns upon the answer to the question whether the fault related primarily to the management of the ship or primarily to the care and handling of her cargo. As Mr. Justice Holmes put it:[10]

"* * * If the primary purpose [of shifting ballast] is to affect the ballast of the ship, the change is management of the vessel; but if, as in view of the findings we must take to have been the case here, the primary purpose is to get the cargo ashore, the fact that it also affects the trim of the vessel does not make it the less a fault of the class which the first section removes from the operation of the third. We think it plain that a case may occur which, in different aspects falls within both sections; and if this be true, the question which section is to govern must be determined by the primary nature and object of the acts which cause the loss."

The purpose in cutting off the dynamos was to protect the vessel as a whole, the ship, her crew and her cargo, from enemy bombs and British gunfire.

The dynamos provided the power to operate the motors of the ventilating fans, but they also supplied all of the other of the ship's needs of electric power. Power to the ventilating fans could not be maintained without maintaining power to living and working spaces and to other electrical equipment. Equipment used in communications, navigation, refrigeration and lighting was dependent upon the same dynamos. When the dynamos were cut off they stopped the operation of all of the ship's electric equipment and appliances, not just the ventilating fans.

It is said, however, that at anchor, in the black out ports, the primary purpose of the dynamos was the ventilation of the cargo. Proof of this is said to lie in the captain's protest to the naval officers that the dynamos were needed to operate the ship's refrigeration and ventilation equipment. The captain, however, did much more than turn off the ventilating fans, an act which would have served his purpose not at all; what he did was to cut off the source of light.

Similar efforts to overly particularize the act which causes the harm have not been successful in obscuring its purpose.[11] Had the dynamos been operated for the ventilation of the cargo, in operation they were a source of light, and the existence of a source of light was thought to threaten the safety of the ship.[12]

The captain was not indifferent to the care of his cargo. He acted as he did, despite his consciousness of the desirability of continuous cargo ventilation, because he thought the safety of the ship required it. Whether one may now say he was right or wrong, his purpose was the protection of his vessel from threatened danger. His acts in furtherance of that purpose cannot be the basis of liability for cargo damage under COGSA.[13]

9. 46 U.S.C.A. § 192.

10. The Germanic (Oceanic Steam Navigation Company v. Aitken), 196 U.S. 589, 25 S.Ct. 317, 318, 49 L.Ed. 610.

11. Leon Bernstein Company v. Wilhelmsen, 5 Cir., 232 F.2d 771; Ravenscroft v. United States, 2 Cir., 88 F.2d 418.

12. Ravenscroft v. United States, footnote 11.

13. See generally: The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; The Germanic (Oceanic Steam Navigation Company v. Aitken), 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610; Ravenscroft v. United States, 2 Cir., 88 F.2d 418; Leon Bernstein Company v. Wilhelmsen, 5 Cir., 232 F.2d 771; Isbrandtsen Co. v. Federal Ins. Co., D.C.S.D.N.Y., 113 F.Supp. 357, affirmed 2 Cir., 205 F.2d 679; Hershey Chocolate Corporation v. The Mars, D.C.E.D.Pa., 172 F.Supp. 321.

We think the District Court was in error in holding the ship responsible for the heat damage to the tobacco.

— — — — — —

After a rehearing in the District Court, a supplemental opinion was filed in which it was said that the ship might present further evidence in support of its defense of inherent vice in the tobacco. The interlocutory decree gave the ship the right, when the question of damages came on to be heard before a commissioner, to specify which bales it claimed were subject to inherent vice and, thereafter, to submit to the District Court any additional evidence it might have in support of that claim.

This rather novel procedure prompted this court to inquire into its own jurisdiction to hear the appeal.

All parties agree that the District Court did not intend that the general defense of inherent vice should be reopened. In the first opinion, the District Court found, contrary to the contentions of the ship, that the moisture content of the Bulgarian tobacco was not higher than that of the tobacco grown in Turkey and Greece and that the heat pockets developed because of the interruption in the ventilation, not because of excessive moisture in the tobacco. He had fully considered the contention that the fact that some bales self-heated while others did not showed inherent vice in those that did.

Everyone agrees that no one determined, by laboratory analysis, the moisture content of any bale of the tobacco. Tobacco men, who made random inspection of the Bulgarian tobacco with their senses of sight, touch and smell, estimated that its moisture content was approximately fifteen per cent. There was evidence to support a finding that a moisture content of fifteen per cent was within the range of tolerance for safe shipment via the short, cool Gibraltar route. The witnesses had no previous experience with the long, hot Suez route, but there was opinion evidence that the tobacco was in good condition, though no one denied that it was susceptible of self-heating when exposed to summer's heat.

The parties had been engaged in marshalling evidence for more than fifteen years. The ship claims no new evidence to support its general defense of inherent vice, and we do not suppose this is what the District Court had in contemplation. We interpret the supplemental memorandum and the decree to permit additional evidence, if any, of inherent vice in specific bales, to the extent that may affect the question of the quantum of the damages, not the substantive rights and liabilities of the parties.

In his supplemental memorandum, appellate review of his interlocutory decree was foreseen by the District Judge. One so careful and experienced in admiralty cases as he would not have expected appellate review before the damages were ascertained if he had intended, generally, to reopen the question of the substantive rights of the parties.

■ We conclude the decree settled the substantive rights of the parties and is appealable under the statute.[14]

— — — — — —

■ During loading, four bales of tobacco were dropped overboard, but were recovered. For the resulting water damage, the ship is clearly liable.

— — — — — —

■ One of the libellants was the owner of a small shipment of olive oil in 5-gallon tins, packed in wooden crates. The Anghyra had taken on this olive oil in Piraeus, and had accepted it as in apparently sound condition. When it was unloaded, the wooden crates were intact, but some of the wood of the crates had been saturated by leaking olive oil. When the crates were opened, some of the tins were found dented or buckled. Olive oil had escaped from opened seams.

The ship sought exoneration by suggesting that the damage might have been caused by rough weather the ship had encountered, but the District Court prop-

14. 28 U.S.C.A. § 1292(a) (3).

erly held that the ship had not proved that the damage was not the result of rough handling.[15]

Affirmed in part, reversed in part, and remanded.

15. American Tobacco Co. v. The Katingo Hadjipatera, 2 Cir., 194 F.2d 449.