306 F.2d 426
 LEKAS & DRIVAS, INC., Pompeian Olive Oil Corporation, and Victor Cory, doing business as Victor Cory Company, Libelants-Appellees,
v.
Basil GOULANDRIS, Nicholas Goulandris and Leonidas Goulandris, doing business as "Goulandris Brothers," Respondents-Appellants.
 No. 346.
 Docket 27239.
 United States Court of Appeals Second Circuit.
 Argued May 1, 1962.
 Decided June 25, 1962.
 
 James E. Freehill (Hill, Betts, Yamaoka, Freehill & Longcope), New York City, for respondents-appellants.
 John W. R. Zisgen, New York City (Bigham, Englar, Jones & Houston), New York City, for libelants-appellees.
 Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 Mussolini's unprovoked attack on Greece on October 28, 1940, touched off a modern Odyssey whose legal consequences have occupied the courts in this circuit for more than twenty years; hopefully, this decision may end the epic.
 
 
 2
 Having taken on cargo at Izmir, Cavalla and Salonica, principally tobacco, the SS. Ioannis P. Goulandris docked at Piraeus on October 26, 1940, before her intended voyage to the United States via Gibraltar, a crossing ordinarily taking 25 to 28 days. Two days later, Italy attacked. The Ioannis was first requisitioned by the Greek Government for a short military mission. Transit of the Mediterranean having become impracticable, she was then directed by her government to proceed to the United States via Suez and the Cape of Good Hope. She sailed from Piraeus on November 10, 1940; she arrived in the United States in May, 1941, her cargo badly damaged during the long, hot voyage.
 
 
 3
 We have previously affirmed Chief Judge Ryan's dismissal, 173 F.Supp. 140, of large claims for damage to the tobacco, 281 F.2d 179 (2 Cir. 1960). The instant appeals relate to much smaller claims allowed by the judge in the same opinion, 173 F.Supp. at 179-180, for damage to a shipment of 308 cases and 7 barrels of a soft cheese known as "Kefalotyri" by libelant Lekas & Drivas, Inc. as consignor and consignee, and of 500 and 350 drums of olive oil, respectively, consigned to libelants Victor Cory Company and Pompeian Olive Oil Corporation.
 
 
 4
 The voyage took place under the difficulties expectable in wartime. The Greek Government had ordered the Ioannis to sail in convoy to Port Said and thereafter to follow the instructions of the British Admiralty; because these orders were confidential, the vessel was unable throughout the voyage to communicate directly with her owners, although communication by way of an intermediary in London did occur during stops in ports along the way. On December 14, the convoy the Ioannis had finally joined, after waiting 16 days at Port Said and three days at Great Bitter Lake, reached Aden. The Ioannis, drawing water uncontrollably through her stern gland and suffering severe vibrations in her tailshaft, dropped out for repairs. Due to the needs of the British Navy, drydock facilities were unavailable, so the tailshaft had to be drawn for inspection while the ship was afloat. To facilitate this, much cargo, including the cheese here in question, had to be removed and stored on lighters, where it was covered with tarpaulins; according to the agreed summary of the master's deposition, "There were no warehouse facilities at Aden where the cargo could be taken." By the uncontradicted deposition of the chief officer, the cheese had not begun to spoil when it was so removed. Wartime conditions caused the repairs, normally taking some three days, to require 35. The chief officer observed that, when the cheese was reloaded, it was spoiling — "it was leaking through the cases and barrels and had begun to develop a certain odor." Thereafter the Ioannis stopped in Durban for 13 days to take on bunkers and to make some condenser repairs; later, after a fire in the tobacco, she was at Barbados for 23 days. The Ioannis finally arrived at Norfolk on May 3, 1941, and in New York on May 8. A surveyor found the cheese to be "Melted with a terrible stench, and worthless"; it was subsequently sold for about a sixth of what its sound value would have been. Seventeen drums of the Cory shipment of olive oil and five of the Pompeian were cut and leaking; also, the latter was one drum short.
 
 
 5
 On May 15, 1941, the owners of most of the tobacco filed libels in the Southern District of New York, alleging damage to their cargo in excess of a million dollars. Nearly a year later, on May 7, 1942, the owners of the cheese and the olive oil (along with one additional tobacco consignee no longer in the case), all acting through the same proctors as the earlier libelants, filed libels. Trial of the consolidated libels was destined to be long deferred — we must recount the highlights of this delay because of the question raised as to the interest award.
 
 
 6
 Orders were first entered staying trial until the end of the war because of inability to get needed testimony in Greece while hostilities persisted. The history of what happened between 1945 and March, 1958, when all the cargo damage claims came to trial before Chief Judge Ryan, largely concerns the tobacco claims — understandably so when it is remembered that the tobacco loss amounted to nearly fifty times as much as the cheese and olive oil damage. 1946 and 1947 were devoted to obtaining answers to interrogatories and taking depositions in Greece. In April, 1948, counsel turned their attention to the trial of a libel primarily concerning damage to tobacco shipped from Piraeus on the SS. Katingo Hadjipatera at the same time and by the same route as the Ioannis' voyage. This was decided in November, 1948, American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438 (S.D. N.Y.1948), modified and aff'd, 194 F.2d 449 (2 Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). In the light of the District Court's decision in that case, libelants' proctor went to Greece and Turkey to see whether additional proof was available for the Ioannis litigation. For reasons not necessary to detail, the process of obtaining this proof lasted until September 1, 1955; all parties then filed notice of readiness for trial. However, counsel preferred to give their attention to still a third case involving similar facts, see Brown & Williamson Tobacco Corp. v. The S.S. Anghyra, 157 F.Supp. 737 (E.D.Va.1957), rev'd in part sub nom. Hellenic Lines Ltd. v. Brown & Williamson Tobacco Corp., 277 F.2d 9 (4 Cir.), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960). In May, 1956, the libels were placed back on the calendar, on condition that an agreed summary of the depositions be prepared; this summary, itself 2000 pages, was not ready until the fall of 1957, and the trial began in March, 1958.
 
 
 7
 On April 9, 1959, Chief Judge Ryan filed a comprehensive opinion, 173 F. Supp. 140, denying the tobacco owners' claims, action which we subsequently affirmed, 281 F.2d 179, and granting those regarding the cheese and the olive oil. After referral of the latter to a Commissioner and dispute over the interest to be awarded, a resettled final decree was filed on July 25, 1961. Lekas & Drivas, Inc. recovered $24,780.21, plus interest at 4½% from May 7, 1945, amounting to $18,083.36. Pompeian Olive Oil Corp. was awarded $1,472.46, with interest, similiarly computed, totalling $1,074.53. Victor Cory Co. was allowed $1,089.82, with interest of $795.30. Respondents appeal from these awards, alleging error both as to liability (save as to the one drum missing from the Pompeian consignment) and as to the award of 16 years' interest.
 
 
 8
 We find no error in the granting of the claims as to the olive oil. Under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1301 et seq., here applicable, a shipper makes out a prima facie case by proving that his goods were delivered to the carrier in good condition and were outturned damaged or not at all; the burden then falls upon the carrier to bring itself within an excepted cause or to prove it exercised due diligence to avoid and prevent the harm: Edmond Weil, Inc. v. American West African Line Inc., 147 F.2d 363, 366 (2 Cir. 1945); American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449, 450 (2 Cir. 1951), cert. denied, 343 U.S. 978, 72 S. Ct. 1076, 96 L.Ed. 1370 (1952); id., 81 F.Supp. 438, 445 (S.D.N.Y.1948); General Foods Corp. v. The Troubador, 98 F.Supp. 207, 209 (S.D.N.Y.1951); Gilmore & Black, Admiralty (1957) 162-163. Chief Judge Ryan found, 173 F. Supp. at 180, that although the olive oil drums were not new, they were sound and tight, and were suitable for the shipments. In fact, the surveyor "couldn't say with certainty" whether the drums were new or second-hand; Judge Ryan evidently took the possibility more favorable to respondents and relied on the same witness' testimony that the drums were "the usual type of drum" employed in the trade. This was entirely permissible; the judge was not bound to follow the testimony of another witness for libelants that used drums were unsafe. Neither was he bound to accept the surveyor's opinion that the leakage resulted from working and pressure of cargo, as meeting the carrier's burden, Hellenic Lines Ltd. v. Brown & Williamson Tobacco Corp., supra, 277 F.2d at 15-16.
 
 
 9
 We likewise see no reason for disturbing Chief Judge Ryan's award of interest. Although the discretion of the district court in allowing interest in admiralty is reviewable for abuse, The Wright, 109 F.2d 699, 702 (2 Cir. 1940), we find none. This is not a case where the libelants were alone responsible for delay in getting to trial. The delay was due in part to inherent difficulties in both sides' obtaining evidence regarded as necessary to the consolidated trial of all the Ioannis cargo claims, a consolidation that saved time and expense for everyone, and in part to an apparent agreement that, as the two other cases involving similar facts reached readiness for trial, it would be wise to postpone trial of the Ioannis libels until these other trials were completed. In admiralty, as elsewhere, "* * * the rationale underlying the award of interest is the desire to make whole the injured party," O'Donnell Transp. Co. v. City of New York, 215 F.2d 92, 95 (2 Cir. 1954); we perceive no reason for not doing that here. Moreover, the court somewhat tempered the blow by starting the running of interest only on May 7, 1945, and by setting it at 4½%.
 
 
 10
 The cheese claim presents a more difficult problem. We have concluded that as to this we must reverse.
 
 
 11
 When the cheese was loaded at Salonica, all 7 barrels and 67 of the cases were stowed in the after part of the No. 4 hold, and the other 241 cases in the poop, along with 704 other cases belonging to parties not in the present litigation. The judge found, 173 F.Supp. at 156, that the cheese "had melted and spoiled due to the high temperatures experienced on the voyage," and, id. at 179, that the poop was an improper place to stow cheese. The latter finding, which was the predicate of liability, was cast in terms of the poop's not being "a fit and proper place for carriage of the cheese from Greece to New York via the Mediterranean-Gibraltar route * * *" The reasoning was that if the voyage had been made as contemplated, the cheese would nevertheless have spoiled; that the legal cause of that spoilage would have been the stowage in the poop; and that the vessel was therefore liable for the damage which in fact occurred.
 
 
 12
 Respondents vigorously attack the judge's conclusion that the poop was an unfit place to stow the cheese. They say that if the voyage had been made via Gibraltar as contemplated, air temperatures would have ranged between 53° and 65° Fahrenheit and that, although the poop had no permanent ventilators, adequate ventilation was had through an open hatch. We find it unnecessary to pass on this challenge, for reasons that will shortly appear.
 
 
 13
 It cannot be disputed that the voyage of the Ioannis was affected by "restraint of princes, rulers, or people" under § 4(2) (g) of COGSA. Indeed, there was a double restraint — the threat of attack by an enemy government on the planned voyage through the Mediterranean and the order of the Greek Government to proceed via Suez and the Cape of Good Hope. "`Restraints of princes, rulers, and peoples' covers any forcible interference with the voyage or adventure at the hands of the constituted government, or ruling power of any country, whether done by it as an enemy of the State to which the ship belongs, or not." Carver's Carriage of Goods by Sea (10 ed.), 129. This "restraint" altered the voyage from a four week trip of 5000 miles through the Mediterranean and North Atlantic, in cool November weather, to a trip of 13,000 miles and five months around Africa, with two crossings of the Equator. Outside temperatures repeatedly hit 110° and above. Even with perfect ventilation in the poop, or with stowage elsewhere under adequate ventilation, the cheese would therefore, unless it were refrigerated, have been subject to extremely high temperatures for a period of time long enough to cause it to spoil.[1] Whether stowage of some of the cheese in the poop was improper for the Gibraltar voyage is thus immaterial; "if the accident would have happened without defendant's negligent act, then such is not the cause of it." 2 Harper & James, The Law of Torts (1956) § 20.2, at p. 1114 fn. 18, and cases there cited; American Law Institute, Restatement of Torts, § 432, comment b and illustrations 1 and 2.
 
 
 14
 We could stop here were it not for the episode at Aden. As to this libelant makes two claims. One is that keeping the cheese on lighters for a month was negligent since respondents should have placed it under refrigeration. The other is that, spoilage having begun, respondents should have sold the cheese rather than reloaded it. We could remand for further consideration of these claims by the district judge who, on his view of the case, did not reach them. However, all the evidence is before us, most of it was given by deposition, and we think it best to bring this long litigation to an end.
 
 
 15
 It will be convenient first to consider the claim as to the master's duty to sell. We do not doubt that circumstances may arise when the master of a ship has not merely the authority but, under § 3(2) of COGSA, the duty to sell cargo that is at risk of further deterioration, communicating with the owner if that is feasible but still having both the authority and duty if it is not. The Australasian Steam Navigation Co. v. Morse, L.R. 4 P.C. 222, 230 (1872); Notara v. Henderson, L.R. 7 Q.B. 225, 236-237 (1872); Carver, supra, 509. This duty exists even if the cause of the deterioration is an excepted cause, Gilmore and Black, Admiralty (1957) 149. If the spoilage had been detected early in the Ioannis' stay at Aden, the master would thus have been bound to endeavor to communicate with the owners via London and, failing contrary instructions, to try to sell the cheese since, even if the price at Aden were well below what had been expected at New York, it still might substantially exceed what would be realized after further spoilage. On the other hand, if the spoilage was not detected until the reloading, it would be imposing a rather heavy burden to say, "now in the peace of a quiet chamber," 277 F.2d at 13, that the master was required further to postpone the already long postponed departure from Aden in order to achieve some possible mitigation of the damages on this relatively small part of the Ioannis' cargo, at the cost of perhaps enhancing the risk to the larger part. The only evidence as to the time of detection of the spoilage is the chief officer's deposition; although far from conclusive, this tends rather to the view that the spoilage was discovered only when the cheese was reloaded. Very likely the foregoing should be further qualified in the sense that the Ioannis was bound to maintain some surveillance while the cargo was on the lighters. As to this the evidence is simply that there were four watchmen on each lighter to see that the cargo was properly ventilated and protected from the elements; whether due diligence on their part would have detected the spoilage before the reloading, the evidence does not disclose.
 
 
 16
 Decision therefore turns, as it so often does in claims of this sort, upon the burden of proof. The classic statement, in Clark v. Barnwell, 12 How. 272, 280, 53 U.S. 272, 280, 13 L.Ed. 985 (1851), is that when a carrier has discharged the burden of showing the existence of an excepting cause, "in this stage and posture of the case, the burden is upon the plaintiff to establish the negligence, as the affirmative lies upon him." From this respondents could argue that, they having shown the "cause" of the loss to be the restraint of princes, the burden of proof shifted back to the libelant. However, libelant might be expected to counter with the statement, in Schnell v. The Vallescura, 293 U.S. 296, 306, 55 S.Ct. 194, 197, 79 L.Ed. 373 (1934), that "Where the state of the proof is such as to show that the damage is due either to an excepted peril or to the carrier's negligent care of the cargo, it is for him to bring himself within the exception or to show that he has not been negligent."
 
 
 17
 In fact, neither Supreme Court decision is directly in point. The respondents in Clark v. Barnwell had not only established a peril of the sea as a cause but had negated all others; libelants in that case not merely failed to sustain a burden, but no evidence of negligence "is found in the record," 12 How. 283, 13 L. Ed. 985. Schnell v. The Vallescura, decided under the Harter Act, was a case in which the ship proved an excepted cause to have been at work and the libelant showed that negligence was also operative; the decision was that the carrier then had to show how much of the damage resulted from the excepted cause or suffer the whole liability. Here respondents proved the restraint of princes to be a cause in the important practical sense that otherwise the stop at Aden and the hot voyage around Africa would not have occurred. However, it might be argued that the possibility that diligence with respect to the cargo at Aden would have reduced the loss is sufficient to cancel recognition of the restraint as the "legal" cause unless the carrier also proves that it discharged its duty, under § 3(2) of COGSA, "properly and carefully [to] load, handle, stow, carry, keep, care for, and discharge the goods carried," — in other words, that the mere raising of the issue as to the carrier's duty to sell places the burden of persuasion back where the shipper's evidence of delivery in good condition and outturn in bad had put it originally. See Note, Cargo Damage at Sea: The Ship's Liability, 27 Tex.L.Rev. 525, 534 (1949).
 
 
 18
 Such a contention gives inadequate weight to the division, made in § 4(2) of COGSA, between the specifically excepted causes (a)-(p) and the "catch-all" (q), to wit, "Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage." To hold that when a carrier has shown that the loss arose as a consequence of restraint of princes, § 4(2) (g), it still has the burden of negating any other fault or neglect of its agents or servants would be to read the qualification of (q) into (a)-(p), although Congress did not put it there. It follows that libelant had the burden of showing circumstances from which a trier of the facts could properly conclude that the master's failure to dispose of the cheese at Aden was a breach of § 3 (2). Had libelant done this, we would have a parallel to Schnell v. The Vallescura, with one cause proved to be excepted and the other not, and the teaching of that case, which we assume to be applicable to COGSA in this respect, would then place upon respondents the burden of showing how much of the damages came from the excepted as distinguished from the unexcepted cause. However, libelant did not sustain the burden required to bring it to that stage.
 
 
 19
 The same analysis disposes of the claim with respect to failure to refrigerate during the stay at Aden, even if we were to assume in libelant's favor that this omission, since it contributed to the spoilage, could be a basis of liability when it was already inevitable that the cheese would spoil, from an excepted cause, on the hot voyage around Africa. See Peaslee, Multiple Causation and Damage, 47 Harv.L.Rev. 1127 (1934); 2 Harper & James, supra, at 1123; American Law Institute, Restatement of Torts Second, Tentative Draft No. 7, § 433B; compare Schroeder Bros., Inc. v. The Saturnia, 226 F.2d 147 (2 Cir. 1955). The only evidence that refrigeration might have been obtainable was general testimony of a witness for libelant, clearly referring to normal conditions, that "they have refrigeration at Aden." Even assuming that this sufficed to raise an issue of negligence, clearly, in the face of the master's deposition that no warehouse facilities of any kind were available at Aden when the Ioannis was there, it did not meet a burden of proof.[2]
 
 
 20
 The decree in favor of libelants Pompeian Olive Oil Corporation and Victor Cory is affirmed; the decree in favor of libelant Lekas & Drivas, Inc. is reversed and the libel dismissed.
 
 
 
 Notes:
 
 
 [1]
 During the summer it is the practice to refrigerate cheese of the sort here involved even for the Gibraltar voyage, precisely because spoilage is otherwise likely, ventilation or no ventilation. However, the bill of lading under which the cheese was shipped provides that "specially cooled stowage is not to be furnished unless contracted for at an increased freight rate." Lekas & Drivas did not so contract; indeed, the Ioannis was known not to have refrigeration available
 
 
 [2]
 No contention is now made that the stop for repairs was caused by unseaworthiness. Chief Judge Ryan found there was none, and we affirmed that finding on the appeal from his dismissal of the tobacco claims, 2 Cir., 281 F.2d 179