MOBIL SALES AND SUPPLY CORPO-
RATION and Bluefield Insurance
Limited, Plaintiffs,

v.

M.V. "BANGLAR KAKOLI," her
engines, boilers, etc.,

v.

BANGLADESH SHIPPING CORPORA-
TION (NATIONAL LINE OF BAN-
GLADESH), Defendants.

STRAW PRODUCTS LIMITED, Ballar-
pur Industries Limited and Commercial
Insurance Company of Newark, New
Jersey, Plaintiffs,

v.

M.V. "BANGLAR KAKOLI," her engines,
boilers, etc., Bangladesh Shipping Cor-
poration, Peralta Shipping Corporation
and Mobil Sales and Supply Corpora-
tion, Defendants.

DAIRY EQUIPMENT AND SUPPLY CO.,
DIVISION OF SAUDI AGRICULTUR-
AL ENTERPRISES, INTERNATIONAL
and St. Paul Mercury Insurance Com-
pany, Plaintiffs,

v.

M.V. "BANGLAR KAKOLI," her engines,
boilers, etc., Bangladesh Shipping Cor-
poration and Mobil Sales and Supply
Corporation, Defendants.

Nos. 81 Civ. 7704, 82 Civ. 2618 and
82 Civ. 6088.

United States District Court,
S.D. New York.

June 13, 1984.

Bigham, Englar, Jones & Houston, New York City, for plaintiffs Mobil Sales and Supply Corp. and Bluefield Ins. Ltd.; Vincent L. Leibell, Jr., William R. Connor, III, New York City, of counsel.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiffs Straw Products Ltd., Ballarpur Industries Ltd., Dairy Equipment & Supply Co., Commercial Ins. Co. of Newark, New Jersey and St. Paul Mercury Ins. Co.; Alan S. Loesberg, Robert E. Daley, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant Bangladesh Shipping Corp.; M.E. DeOrchis, Ara A. Shimshidian, Manuel R. Llorca, New York City, of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

These are three consolidated admiralty actions in which plaintiffs (1) Mobil Sales and Supply Corporation ("Mobil"), (2) Straw Products Limited and Ballapur Industries Limited ("Straw Products"), and (3) Dairy Equipment and Supply Co.

("Dairy Equipment")[1] seek to recover damages from the vessel, the M.V. Banglar Kakoli ("the Banglar Kakoli"), in rem, and her owner, Bangladesh Shipping Corporation (collectively, "Bangladesh" or "defendants"), in personam, as a result of defendants' acts contrary to contractual and statutory duties to deliver plaintiffs' cargo in good condition to ports in Saudi Arabia and India.

Essentially, each plaintiff shipper claims that Bangladesh is liable to it for cargo loss or damage because of Bangladesh's improper conduct in (1) stowing cargo; (2) deviating from the customary course; and (3) mishandling cargo at foreign ports. Bangladesh denies liability. It asserts as defenses under the Carriage of Goods by Sea Act[2] ("COGSA") that the losses sustained were caused by either (1) Mobil's improper packaging of its shipment; (2) perils of the sea; (3) errors in navigation; (4) restraints of princes; or (5) a combination of one or more of these causes. In addition, Bangladesh counterclaims against Mobil for damages incurred in connection with discharging, stowing, and cleaning up after, damaged cargo, as well as for damages for which it may be held liable to the other shippers.

Straw Products and Dairy Equipment also assert claims against Mobil. In substance, these parallel Bangladesh's defense and claim for contribution—that Mobil had improperly and insufficiently packaged its shipment. Mobil denies liability to Bangladesh upon its counterclaims and also denies liability to Straw Products and Dairy Equipment. During the course of the trial, Bangladesh settled with Straw Products and Dairy Equipment, who assigned to Bangladesh their claims against Mobil. With the issues thus somewhat narrowed, the trial continued with Mobil and Bangladesh as the sole litigants.

On the voyage in issue, the Banglar Kakoli was hired to carry cargo from various United States ports on the Gulf of Mexico and eastern seaboard to points in Saudi Arabia and India. The vessel, which at the time of the voyage had been in service for about one year, has four hatches, each with an upper tween deck and a lower hold for cargo carriage. On October 18, 1980, at Savannah, Georgia, the Banglar Kakoli took on board bales of woodpulp consigned for delivery to Calcutta, India. These were loaded into the No. 1 lower hold. Straw Products was the purchaser and consignee of this shipment.

The vessel then proceeded to New Orleans, Houston, and New York, taking on at each port additional consignments of cargo. On November 13, 1980, at Philadelphia, the Banglar Kakoli received for shipment to Jeddah, Saudi Arabia, a consignment of two surge tanks and one crate of spare parts. This consignment was loaded into the No. 1 upper tween deck. Dairy Equipment was the seller and owner of this consignment.

The Banglar Kakoli then proceeded to Paulsboro, New Jersey, where, on November 17, 1980, Mobil delivered from its warehouse to the ship's side for loading a consignment of lubricating oil for transport to Jeddah. As will hereinafter be described in greater detail, the Mobil oil was packaged in 40 drums and 840,000 one quart cans, packed in cartons, which were in turn stacked on pallets. The Mobil shipment was loaded into the No. 1 and No. 4 upper tween decks by stevedores engaged by Bangladesh. The vessel then returned to Philadelphia, where consignments of crated cooling towers were loaded into the hatch squares of No. 1 and No. 4 tween decks. Cooling towers were also loaded, along with other cargo, on the deck of the vessel. Mobil contends that the stowage of its shipment of oil at Paulsboro by Bangladesh and its alleged rearrangement at Philadelphia to accommodate other cargo was negligent, whereas Bangladesh asserts that defects in the packaging of the oil shipment rendered Mobil's consignment unfit for a winter voyage over the Atlantic.

---

1. Also joined as plaintiffs are the shippers' insurance carriers.

2. 46 U.S.C. §§ 1300–15 (1982).

On about November 20, 1980,[3] the Banglar Kakoli departed Philadelphia and commenced her transatlantic voyage. According to the ship's deck log, the first port of call was to be Port Said, Egypt, on the Suez Canal, where the Banglar Kakoli was to take on provisions and refuel before proceeding on its direct line to Jeddah, Saudi Arabia, the first unloading port.

The deck log and cables from the master also show that the Banglar Kakoli, while on its great circle route toward Gibraltar and the Mediterranean, encountered rough weather beginning about November 22, 1980. The deck log entries from the 22nd through the 24th of November repeatedly refer to "very rough sea[s]," "very high seas ... and heavy swells," and "shipping heavy seas on deck continuously[.]"[4] Winds of Force 10 on the Beaufort Scale were recorded on all three days.

To escape the storm, the master on November 24th altered course, taking the vessel southeast from its position at 42° north latitude to a position at approximately 36° north latitude. This evasive tactic was not effective, because the storm, instead of following the usual northeasterly course of North Atlantic storms, followed a southeasterly track.[5] Hence, instead of escaping the storm, the Banglar Kakoli continued on in its path.[6] Bangladesh contends that damage to cargo was proximately caused by events from November 22 through November 25, and that it is excused from any liability to cargo for this damage because such damage arose from the "[a]ct or omission of the shipper"[7] (i.e., Mobil); a "peril of the sea";[8] or an "[a]ct, neglect, or default of the master."[9] On the other hand, as already noted, Mobil contends that any

damage arising in this period derived from Bangladesh's failure "properly and carefully [to] load, handle, stow, carry, keep, [and] care for ... the goods carried."[10]

While the Banglar Kakoli was contending with the storm, at about 1:29 a.m. local time, November 25, 1980 (4:59 a.m., November 25, Greenwich Mean Time),[11] the vessel received a cable from defendants' agents in London ordering it to "proceed to London" to take on a cargo of railroad cars. The master requested from his San Francisco navigational service the "best route and expected weather" for a voyage to London. The deck log indicates that on November 25 the vessel changed course from southeast to due east and the next day made a heading for Felixstowe, England, on a route to London. Mobil claims that this trip to London constituted an unreasonable deviation, a claim Bangladesh denies and, in the alternative, seeks to avoid with its contention that all damage to cargo occurred prior to the time the Banglar Kakoli turned to London—in sum, even if it is found that there was an unreasonable deviation, the deviation was not the proximate cause of the damage.

Fifteen days after leaving Philadelphia, on December 4, 1980, the vessel arrived at the Port of London. There, Bangladesh representatives and a surveyor, Captain John G. Campbell, retained on Bangladesh's behalf, attended on board the vessel. These representatives observed that in the No. 2 tween deck, forty bales of rags and five packages of machinery and general cargo were scattered all over the square of the hatch, having been thrown out from the wings. Bangladesh representatives at Lon-

---

3. The deck log states that the vessel cleared its berth at 11:20 p.m. on November 19, 1980. *See* Mobil Ex. 45A, at 34.

4. *Id.* at 37–39; *see also id.* at 39 ("shipping heavy seas all over deck").

5. Tr. 801–02 (Bangladesh meteorologist).

6. Deck log entries from November 25 record that the vessel was "rolling heavily" and "violently" on "very rough sea[s.]" Mobil Ex. 45A, at 40.

7. 46 U.S.C. § 1304(2)(i) (1982); *see also id.* § 1304(2)(n) ("[i]nsufficiency of packaging").

8. *Id.* § 1304(2)(c).

9. *Id.* § 1304(2)(a).

10. *Id.* § 1303(2).

11. *See* Bangladesh Ex. L–12.

don or their agents retained gangs of stevedores and longshoremen to restow and resecure the cargo in the No. 2 tween deck and to load the cargo of railroad cars. The Bangladesh representatives also observed, in addition to the disarray in No. 2 tween deck, attended to by the stevedores, that the consignments in the Nos. 1 and 4 tween decks, that is, the Mobil shipment, surge tanks, spare parts, and cooling towers, among other items, had shifted or collapsed in stow. The vessel's first officer, for example, testified that pallets of oil were "in broken condition" and the cartons holding the quart cans were "stained." Yet Bangladesh did not direct that the damaged consignments in the Nos. 1 and 4 upper tween decks be discharged at London, did not restow or resecure such consignments, and took no action to ascertain, with specificity, the damage to the shipments in those holds. Nor did Bangladesh notify Mobil, which had offices in London, or any of the other consignees of the damage or condition of the cargo. Mobil contends this conduct evinces Bangladesh's further breach of duty to cargo, while Bangladesh asserts that the actions demanded of it by Mobil could have served no purpose because local environmental laws and labor policies would have prevented restowing Mobil's shipment, that is, that Bangladesh was faced with a "restraint of princes."

On December 6, 1980, the Banglar Kakoli departed from the Port of London with the Nos. 1 and 4 upper tween decks in the same condition as when the vessel arrived two days earlier. She proceeded toward Port Said, encountering very rough seas, this time off Gibraltar, on December 10 and 11, causing her "to pitch heavily," "pound violently," and "ship heavy seas on deck." Mobil claims this weather further damaged its consignment of oil, which Bangladesh denies. After passing through the Suez Canal, the vessel arrived at Jeddah on December 20, where Bangladesh's cargo superintendent, Captain M.A. Jalil, William D. Baskerville, a surveyor, also acting on behalf of Bangladesh, and Captain Z.A. Zuberi, an independent marine surveyor hired by the Arabian Petroleum Supply Company, the purchaser of the Mobil oil, examined the consignments of cargo in the No. 1 and No. 4 tween decks. Neither the Mobil consignment nor the Dairy Equipment consignment were discharged at Jeddah, the port designated in their respective bills of lading. Bangladesh asserts the failure to discharge arose from enforcement by the Saudi Arabian port authorities of environmental regulations barring the unloading of the damaged cargo, a claim Mobil does not dispute, but which Mobil instead asserts is irrelevant in light of the vessel's alleged continued breaches of duty, including the overstowage of other cargo on top of the Mobil pallets, preventing discharge of the latter at Jeddah.

Thus, on January 5, 1981, the Banglar Kakoli sailed from Jeddah to Chittagong, Bangladesh, the vessel's home port. After she arrived in Chittagong on January 17, Captain Baskerville and Luftee M. Ayub, of James Finlay and Company, Ltd., which had been retained by both Bangladesh and the cargo interests, came aboard. Between January 17 and February 13, 1981, the Banglar Kakoli discharged all consignments of cargo, except those to be delivered at Calcutta, to the Chittagong pier/terminal area. In addition, on February 4, 1981, the M.V. Khulna ("the Khulna"), a coasting vessel owned and operated by Bangladesh, tied up alongside the Banglar Kakoli in order to receive the cargo destined for Calcutta. Discharge from the Banglar Kakoli into the Khulna was complete by February 13.

Both Captain Baskerville's and Mr. Ayub's survey reports indicate that at outturn at Chittagong the Mobil consignment had sustained substantial damage. The surge tanks and spare parts, owned by Dairy Equipment, and the woodpulp, owned by Straw Products, were also noted as severely damaged. Bangladesh delivered the remains of the Straw Products cargo to Calcutta, where they were rejected by the shippers. No part of the Dairy Equipment Cargo nor of the Mobil shipment was ever delivered to their designated destinations. In fact, Mobil alleges that

the remains of its shipment upon outturn at Chittagong were left uncovered at the pier/terminal area and further damaged by rain. Finally, a salvage sale was arranged for the Mobil oil, which realized a sum of $69,990.37, $642,102.50 less than the contract price upon delivery of the cargo in sound condition at Jeddah.

Against the foregoing recital of facts and contentions, the Court turns to the matters in issue. Because the adequacy of the Mobil shipment's packaging affects not only Bangladesh's liability to Mobil, but also Mobil's liability to Bangladesh and also to other cargo claimants (now represented by Bangladesh),[12] we first address this issue.

## I.

## PACKAGING OF THE MOBIL SHIPMENT

■ The Mobil consignment of lubricating oil delivered from the Mobil warehouse at Paulsboro, New Jersey, to the pier where the Banglar Kakoli was berthed was packaged in 40 drums and 35,000 cartons (each carton containing twenty-four one quart cans) on pallets.[13] Stevedores hired by Bangladesh loaded the pallets onto the vessel and stowed them in the Nos. 1 and 4 tween decks. The chief officer of the vessel, who also acted as the cargo officer, observed the ship's tackle lift the Mobil cargo and place it in the holds. Upon completion of the loading of the Mobil consignment at Paulsboro, "clean" bills of lading were issued. It is not disputed that upon its outturn at Chittagong the shipment was damaged. Thus, in the absence of a hidden defect,[14] Mobil has established a prima facie case for recovery from Bangladesh.[15] It is well settled law that "[w]hen the consignee proves its prima facie case, the burden shifts to the carrier to show that the loss or damage falls within one of the COGSA exceptions set forth in 46 U.S.C. § 1304(2) (1976)."[16] Bangladesh's contention that it is exonerated from liability to Mobil rests, in part, upon a claim that the damage to the Mobil cargo arose from an "act or omission of the shipper or owner of the goods,"[17] that is, Mobil's improper packaging.

Bangladesh contends that the Mobil packaging was inadequate in that the method of unitizing[18] the cartons on the pallets was not proper for a November or December voyage via the North Atlantic. It faults Mobil for not using "breakaway glue," "shrink wrap," or "stretch wrap" to prevent the cartons from falling off the pallet. Bangladesh also asserts Mobil was negligent in failing to use horizontal straps to keep the cartons in a single unit on the pallet and in so placing the straps it did use so that they could be loosened by normal carrying on a forklift. These alleged defects were all patently obvious to the ship's officers, who observed the loading of the Mobil pallets and issued the "clean" bills of lading. Bangladesh's claims thus present no question of inherent defect,[19] and instead turn on whether Mobil's oil was negligently packaged.

**12.** See *Nissho-Iwai Co. v. M/T Stolt Lion,* 617 F.2d 907, 911 (2d Cir.1980).

**13.** Mobil also shipped a number of empty cartons to Jeddah. Tr. 986.

**14.** See *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 352 (2d Cir.1981); *The Niel Maersk,* 91 F.2d 932, 933–34 (2d Cir.), *cert. denied,* 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937).

**15.** See, e.g., *Nissho-Iwai Co., Ltd. v. M/T Stolt Lion,* 719 F.2d 34, 37, 41 (2d Cir.1983); *Spencer Kellog, Div. of Textron, Inc. v. S.S. "Mormacsea,"* 703 F.2d 44, 46 (2d Cir.1983); *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir. 1982) (citing cases).

**16.** *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982) (citing *Vana Trading Co. v. S.S. "Mette Skou,"* 556 F.2d 100, 104 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

**17.** 46 U.S.C. § 1304(2)(i) (1982); *see also id.* § 1304(2)(n) ("[i]nsufficiency of packaging").

**18.** A pallet is unitized when straps are put around it to make it into one solid shipping package.

**19.** See *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 353 (2d Cir.1981).

At the time they were used in the shipment on the Banglar Kakoli, Mobil's one quart export cans had been employed for more than fifteen years with no serious difficulty. The concept of and specifications for the can and can lid were developed by a petroleum packaging committee of the Packaging Institute of America in the middle of the 1960s. The cans are made of spirally wound fiberboard with a tin top. The base is tinplated steel. The entire interior of the can is lined with polyethelene to prevent saturation of the fibreboard and leaking. For shipment, the cans are placed in cartons by a conveyor or assembly, twelve quarts on the bottom and twelve directly on top—that is, twenty-four quart cans in one carton. The export carton in which the cans were shipped aboard the Banglar Kakoli had, at the time of the voyage, been in use roughly 23 years. It has a bursting strength of 350 pounds per square inch, as contrasted with the carton in domestic use, which has a bursting strength of only 200 pounds per square inch. After the cans are placed inside the carton, the carton flaps are glued on the bottom and top by a gluing machine.

Mobil's pallet arrangement, at the time of the voyage, had been in use approximately ten years. Each pallet has a total of fifty cartons, assembled in five tiers of ten cartons on a tier. The cartons are "interlocking," that is, the first, third, and fifth tiers are stacked in the same pattern and the second and fourth in an opposite pattern. The cartons are strapped to the pallets by the four steel bands of 30.35 gauge so that each side of the pallet is bound by two straps; the straps run up and down the sides of the stacked cartons and cross at the top and bottom of the pallet. Cornerboards thirty-five inches long are placed between the top cartons and the steel straps. The purpose of the steel strapping and cornerboard arrangement is to bring downward pressure to bear upon the stack of cartons, thus reinforcing the "interlock" effect. The pallets

are moved from Mobil's warehouse at Paulsboro by forklifts and then placed on the wharf under the ship's gear. Leaking cans are removed prior to delivery to the ship. Once on the wharf, the pallets are picked up by stevedores, engaged by the ship, using spreader hooks or a sling.

During the course of a year, between twenty-four and twenty-six cargo vessels call at the Mobil refinery at Paulsboro and receive Mobil products packaged by the method just described—cans placed in cartons stacked on pallets. Prior to November 1980, Bangladesh vessels accepted for ocean shipment pallets of Mobil lubricating oil of the same type as those accepted under the bills of lading issued for the Mobil shipment from Paulsboro to Jeddah. It was evident that in the prior shipments "stretch wrap," "shrink wrap," and "breakaway glue" were not used, and yet the ships' officers neither noted exceptions on the bills of lading nor rejected the shipments. The evidence also established that there was no known instance over the years in which any other company ever rejected the pallets for overseas shipment.[20] The testimony of Bangladesh's expert, who visited Mobil's refinery, packaging, and exporting warehouse facilities more than two years after the events in this case occurred, is unpersuasive and must yield to the facts that resulted in the damage to the cargo as of the time of its occurrence. The test of a unitized pallet performed by the defendants' expert did not simulate the forces acting on the Mobil pallets, as they were stowed aboard the Banglar Kakoli.

With respect to the initial disputed issue of whether the Mobil shipment was properly packaged upon its delivery to the carrier, the Court finds upon the totality of evidence, including the testimony of experts, that the pallets holding fifty cartons, with twenty-four one quart cans of oil in each, and bound as described above, were, upon their delivery to Bangladesh, in good condi-

20. Although Captain Jalil testified that Bangladesh had "some cases" in which there was cause to complain about the Mobil packaging, he conceded that Bangladesh had in fact never complained to Mobil about leakage. Tr. 279–81.

tion and properly packaged for the anticipated voyage. The defendants' contention to the contrary is repelled, not only by prior practice and experience with the Mobil packaging over an extended period, but also by the fact that the chief mate and other officers of the Banglar Kakoli observed the loading of the pallets and found no fault with the packaging of the shipment and made no complaint with respect thereto or issued any exception on the bill of lading. Bangladesh's contention that breakaway glue, shrink wrap, stretch wrap, or other packing methods would reasonably reduce the risk of leakage is not supported by the record. The testimony revealed that breakaway glue was used on only one occasion and that stretch wrap had been tested on four transoceanic voyages and discontinued. In the absence of any facts indicating the contrary, it is fair to assume that these experiments revealed the inadequacy of the materials Bangladesh claims should have been used. This conclusion is reinforced by the evidence that use of steel straps—the current "unitizing" method—is more expensive and time-consuming than the use of stretch wrap. Bangladesh failed to offer any reason why Mobil would spend more money and time to package its pallets in a less secure manner. The burden of showing defective packaging was upon the defendants, and this burden they failed to carry. A fortiori, Mobil is not liable to Bangladesh for any damages to the ship arising from oil that leaked from its shipment, nor is it liable to Bangladesh insofar as the latter stands in the shoes of the settling plaintiffs, Dairy Equipment and Straw Products.

## II.

## DEVIATION

Given the foregoing findings that Bangladesh received the Mobil cargo in good condition and properly packaged, it is desirable, before considering Bangladesh's contentions that damage to Mobil's oil was caused by "perils of the sea," "neglect of the master," or "restraint of princes," to address another issue: Mobil's claim that the Banglar Kakoli unreasonably deviated by proceeding to the Port of London instead of continuing on its great circle route to Gibraltar and then on to Port Said. This is so for two reasons. First, even if Bangladesh could otherwise avail itself of COGSA defenses, if it is found that the Banglar Kakoli did deviate from the agreed voyage, and that the damage to cargo is properly attributable to the deviation,[21] Bangladesh would not be exonerated from liability. Second, even if Bangladesh cannot make out an applicable COGSA defense, and therefore cannot overcome Mobil's prima facie case, Mobil could still be entitled to a determination on the question of unreasonable deviation since, in the absence of a finding that the damage to its cargo was caused by such a deviation, Mobil's claims would be subject to COGSA's $500 per package limitation on liability. Depending upon whether the relevant "package" is a carton or a pallet of Mobil oil, Mobil's recovery, if there is no finding of deviation, could be considerably reduced. The determination of the relevant package, which has been repeatedly characterized by our Court of Appeals as a " 'troublesome conundrum,' "[22] was not addressed by the parties either in their briefs or stipulations of fact,[23] and need not be made if the

---

**21.** This "attribution" question is twofold, requiring determination of (1) whether the deviation proximately caused *any* damage to cargo; and (2) whether Bangladesh has adequately identified what damage, if any, arose from non-deviation causes. *See infra.*

**22.** *Allied Int'l Am. Eagle Trading Corp. v. S.S. "Yang Ming,"* 672 F.2d 1055, 1057 (2d Cir.1982) (quoting *Mitsubishi Int'l Corp. v. S.S. Palmetto State,* 311 F.2d 382, 383 (2d Cir.1962), *cert. denied,* 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422

(1963)); *see Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft,* 375 F.2d 943 (2d Cir.1967).

**23.** Although under the decision in *Allied Int'l Am. Eagle Trading Corp. v. S.S. "Yang Ming,"* 672 F.2d 1055 (2d Cir.1982), the issue would be determined by "straight-forward contract analysis," *id.* at 1057, the application of that analysis to the instant facts is not as simple as in *Allied. Compare id.* at 1056 (describing bill of lading with unambiguous denomination of "Total

damage is properly attributable to the deviation. Accordingly, we turn to deviation first.

Mobil's contention of unreasonable deviation raises three issues. First, did the Banglar Kakoli deviate? Second, was this deviation unreasonable?[24] Third, if there was an unreasonable deviation, what consequences follow with respect to Bangladesh's liability? We consider each of these questions in turn.

## A. Deviation from the Agreed Voyage

[2] The first issue—whether a deviation occurred—turns upon "what the contract voyage is to be taken to be."[25] To support its contention that a stopover in London was not authorized by the contract between Mobile and Bangladesh, Mobil relies on the bills of lading issued upon delivery of the lubricating oil to the vessel's agents at Paulsboro.[26] The bills of lading list Jeddah, Saudi Arabia, as the port of delivery. Mobil thus asserts that, in the absence of any express authorization for a stopover in London, its contract with Bangladesh was to be governed by the well-established presumption that " '[t]he shipowner's undertaking is that he will be diligent in carrying the goods on the agreed voyage and will do so *directly* ....' "[27] Mobil thus asserts that Bangladesh was bound to carry its shipment of oil by a direct route, unless it is shown that the "agreed voyage" was clearly to the contrary.[28] The evidence es-tablished that London is not on the direct route from Philadelphia/Paulsboro to Jeddah, Saudi Arabia. Indeed, the uncontradicted testimony of plaintiff's witness, Captain Robert J. Wall, was that the most direct route from Philadelphia to Gibraltar entailed a voyage of 3,344 nautical miles and that the most direct route from Philadelphia to Gibraltar, via London, required 4992 nautical miles' travel. The voyage to London thus added, at a minimum, 1,648 nautical miles to the direct route from Philadelphia to Jeddah, Saudi Arabia.[29]

In support of its claim of unreasonable deviation, Mobil also introduced into evidence Bangladesh's advertisements in the Journal of Commerce, none of which listed London, or any port in its vicinity, as a foreign port of call. In addition, Captain Jalil testified by deposition that Bangladesh operated a "liner service" and not "tramp ships," and that the latter, as is known in the shipping trade, "can go to any port" without notice to the shipper.

To rebut Mobil's proof, Bangladesh points to several facts in the trial record: the stop at London was tentatively booked in Philadelphia, to be confirmed when the Banglar Kakoli was at sea; the Bangladesh advertisements stated that defendants offered only an "independent regular service" and not "direct" or "express" service to the Mideast or Asian subcontinent; Mobil's witness, Ayed Hassan Kahn, supply

---

Number of Packages") *with* Mobil Ex. 4 (bill of lading listing "no. of pkgs." as "35000" but "description of packages" as "700 pallets said to contain ctns-oil, lubricating").

24. *See P & E Shipping Corp. v. Empressa Cubana Exportadora E Importadora De Alimentos,* 335 F.2d 678, 679 (1st Cir.1964) (noting importance of distinction between "no deviation" and "a permissible deviation").

25. G. Gilmore & C. Black, *The Law of Admiralty* § 3–40, at 177 (2d ed. 1975); *see Spartus Corp. v. S/S Yafo,* 590 F.2d 1310, 1313 (5th Cir.1979) (quoting *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt A.G.,* 28 F.2d 249, 251 (3rd Cir.1928)).

26. The bills of lading state they are "a contract with the actual owner or demise or time char- terer of the vessel as principal." *See* Mobil Ex 4, ¶ 1. COGSA provides that a "bill of lading [may be] evidence of a contract for the carriage of goods by sea." 46 U.S.C. § 1300 (1982).

27. *S.S. Willdomino v. Citro Chem. Co.,* 272 U.S. 718, 727, 47 S.Ct. 261, 262, 71 L.Ed. 491 (1927) (quoting Carver, *Carriage of Goods by Sea* 393 (3rd ed. 1900)) (emphasis added).

28. *See Carver's Carriage by Sea* § 1161 (13th ed. 1982) ("Subject to any customary practice, the ship ought to take the most direct, safe, course to her destination.").

29. Because of its attempt to evade the storm, the Banglar Kakoli actually travelled approximately 415 nautical miles in excess of the distance along the direct route from Philadelphia to London. *See* Tr. 30, 1149.

coordinator for the Arabian Petroleum Supply Company, the purchaser of the oil, testified that it was not customary for ocean-going carriers to notify consignees of "all the ports of call that a vessel makes"; none of the shippers whose consignments were loaded prior to Mobil's received "direct" service to their contracted points of discharge, because Paulsboro, where the Mobil shipment was loaded, was far off the direct courses from either Savannah, New Orleans, or Houston, to intended destinations in the Mideast or Asian subcontinent; Jeddah itself was not listed as a port of call in the Journal of Commerce advertisements, nor was Paulsboro; and nothing indicated Mobil had actually relied on the Journal of Commerce announcements.

In addition, Captain Jalil testified that "[m]any of our ships do" go to London on their eastbound voyages and that as a general practice Bangladesh personnel were "working parcels from London."

Bangladesh also relies on provisions in the bills of lading, stating, albeit in fine print:

> The vessel may omit calling at any port whether scheduled or not, may deviate from or change the advertised, geographical, usual, ordinary or intended route at any stage of the voyage, may proceed beyond, or in a contrary direction to the port of discharge, may stay at and load or discharge at any place whatever as inducements or convenience may offer, backwards or forwards, once or oftener and may load, carry or discharge cargo at, for or between intermediate or other ports, whether on this voyage or a preceding or subsequent voyage, even though two or more such voyages may overlap.

30. The deck log indicates that the voyage from Philadelphia to Paulsboro took about three hours, including the time for maneuvering into the berth at Paulsboro. *See* Mobil Ex. 45A, at 31. The voyage to Paulsboro could not have led Mobil to suspect a voyage to London.

31. *See id.* at 35.

32. *See Farr v. Hain S.S. Co.,* 121 F.2d 940, 944 (2d Cir.1941) (L. Hand, J.).

The Court finds that Mobil's proof convincingly established that the contemplated voyage was a direct one—either from Paulsboro or from one of the United States ports specifically listed in the Journal of Commerce[30]—to points on the Asian subcontinent and ports such as Port Said and Jeddah, Saudi Arabia, along the route thereto. Bangladesh's attempts to rebut this showing are without force. Bangladesh's assertion that Mobil had either actual or constructive knowledge of a stopover in London is not supported by the trial record or applicable law.

As Bangladesh concedes, and as the deck logs indicate,[31] the Banglar Kakoli set out from Philadelphia on a direct voyage to Port Said. Such was her destination until her master, some five days out of port, received a cable directing that the vessel proceed to London. Whatever Bangladesh's contingent arrangements before leaving Paulsboro with the Mobil cargo, there is not one shred of evidence in the record indicating that these plans were communicated to, much less consented to by Mobil before initiation of the voyage. Nor is there any evidence that Mobil at any time during the voyage gave its approval for the diversion to London.[32]

Although the Journal of Commerce advertisements do not explicitly promote a "direct" service[33] from Paulsboro to Jeddah, Saudi Arabia, Bangladesh's efforts to read into the advertisements a basis for Mobil's consent to a side trip to the Port of London are strained and unpersuasive. The advertisements list as foreign ports of call only cities on the Asian subcontinent—Chittagong, Chalna, Calcutta, Colombo, Cochin, and "other East Coast of India Ports on inducement[.]" There is no mention—or

33. The words "Independent Regular Service," as used in the advertisements, have little significance for purposes of this case. They establish that Bangladesh held itself out as a common carrier, *cf. Liverpool & G.W. Steam Co. v. Phenix Ins. Co.,* 129 U.S. 397, 437, 9 S.Ct. 469, 470, 32 L.Ed. 788 (1889) (quoting decision below).

even suggestion—of London, or any other northern European port. That Mobil contracted for service to Jeddah, Saudi Arabia, is entirely consistent with this listing of foreign ports of call, inasmuch as Jeddah is on the direct route to the Asian subcontinent. There is no support in the record for the proposition that, by its contract of carriage to Jeddah, Mobil was placed on notice that an extra 1,648 nautical miles would be added to the advertised voyage to the Asian subcontinent.

That other shippers may have had no reasonable expectation of direct service does nothing to undermine this conclusion. The advertisements in the Journal of Commerce plainly indicate that the Banglar Kakoli would call at Philadelphia, just across the Delaware River from Paulsboro, New Jersey, after calling at the other three listed[34] United States ports—New Orleans, Houston, and New York.[35] Philadelphia was in fact the Banglar Kakoli's last port of call in the United States before it left on its transatlantic voyage. Even assuming, arguendo, that direct service could not have been reasonably expected by Mobil, there is nothing to indicate the indirect service that was to be expected would be via London. Nothing in the advertisements gives rise to the inference that the Banglar Kakoli's usual and customary mode of operation was as a "tramp" vessel—free to roam from port to port with no set timetable. Indeed, the listing of domestic ports of call indicates the opposite—that, as Captain Jalil testified, Bangladesh held out the Banglar Kakoli as a liner vessel that did not stop at a particular port unless it was an advertised port of call or on the direct route thereto.[36]

Captain Jalil's unsupported and vague allusions in his deposition testimony to the "[m]any" voyages by Bangladesh vessels to London from the eastern United States do not overcome Mobil's proof, even assuming they are true. Nor is it material that Mobil failed to adduce proof that it relied on the Journal of Commerce advertisements. A route, other than the direct route, "will ... be considered customary [only] when the route is 'established and by all means published to the world.' "[37] In this instance there was no proof that calls by Bangladesh vessels at London "were ... generally published to the shipping community."[38] It is sufficient for Mobil to prove that the safest direct route did not entail stopping at London and that Bangladesh failed to notify Mobil or the shipping community that the Banglar Kakoli was intending to call at London.

Bangladesh's reliance on the so-called liberties clause in the bill of lading is also misplaced. As our Court of Appeals only recently reiterated, notwithstanding the terms of a liberties clause, COSGA "clearly implies that any unreasonable deviation is to be treated as a breach of COGSA and the contract of carriage."[39] Indeed, "[a]

---

**34.** Savannah, where the vessel called on October 18, 1980, is not listed in the advertisements submitted as one of the Banglar Kakoli's scheduled ports of call. However, Savannah, unlike London, is listed as a port of call for other Bangladesh vessels, see Mobil Ex. 44.

**35.** The advertisements of October 1 and October 31, 1980, announced the arrival of the Banglar Kakoli in New Orleans on October 27, 1980, in Houston on October 30, 1980, and in Philadelphia on November 14, 1980. See id.

The advertised schedules of other Bangladesh vessels, although somewhat more irregular, follow this general pattern. See id.

**36.** It is a matter of acknowledged custom that a "liner" service is held "to a high degree of schedule exactness upon which the shipping community relies." General Elec. Co. Int'l Sales Div. v.

S.S. Nancy Lykes, 706 F.2d 80, 84 n. 3 (2d Cir.1983). Indeed, Bangladesh's numerous published changes in arrival dates at scheduled ports, see Mobil Ex. 44, suggest that the carrier intended that the shipping community rely on the information in its advertisements.

**37.** General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes, 706 F.2d 80, 85 (2d Cir.1983) (quoting W.R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, 12 F.2d 519, 521 (9th Cir.), cert. denied, 273 U.S. 717, 47 S.Ct. 109, 71 L.Ed. 856 (1926)). Thus, that, as Kahn testified, not all stops are customarily communicated to shippers, Tr. 504, does not excuse Bangladesh's conduct.

**38.** General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes, 706 F.2d 80, 85 (2d Cir.1983).

**39.** Id. at 83.

construction of liberties clauses that allowed carriers to deviate with impunity would seriously erode the carrier's primary duty under § 3(2) of COGSA ... 'properly ... [to] carry ... [and] care for ... the goods carried,' and thus would be contrary to COGSA's design of forbidding carriers from contracting out of liability for their own wrongdoing." [40] The liberties clause in this instance has no effect on the contract of carriage other than to authorize a "reasonable" deviation. It does not affect the basic contract of carriage for purposes of determining what is a deviation.[41] Here, the contract was for a direct voyage from Paulsboro to Jeddah, and it is clear that the Banglar Kakoli strayed from the contemplated route.[42] Having determined there was a deviation from the customary and agreed upon route, the Court turns to the question of reasonableness.

## B. The Reasonableness of the Deviation

Because the voyage to London manifestly was for the purpose of loading additional cargo, § 4(4) of COGSA comes into play. That section provides:

Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.[43]

Accordingly, the burden upon the trial was upon Bangladesh to show that the deviation was reasonable.

To meet this burden, Bangladesh relies on a number of arguments, most of which are more properly addressed, and, accordingly have been discussed, in the context of whether there was a deviation at all. Two merit discussion here. First, Bangladesh asserts that because it deviated to London and obtained further revenue it thereby reduced, if not on this voyage then at least over the long run, the costs of shipping. This argument does nothing more than restate that the Banglar Kakoli deviated in order to load cargo at London, an act Congress expressly declared in COGSA to be prima facie unreasonable. Needless to say, there was no evidence that Bangladesh had any intention of sharing the profit from the London cargo with Mobil or the other shippers. Quite to the contrary, Bangladesh's course of conduct in failing to inform cargo of the side trip to London strongly confirms that defendants' acts in diverting the vessel on November 26 were solely self-motivated and in disregard of their continuing duty to care for cargo.[44] This conclusion is confirmed by Bangladesh's actions at London. The undisputed fact is that upon arrival at the Port of London, the Mobil cargo was badly damaged and in disarray, yet nothing was done to correct the condition and the vessel departed from London with the Mobil cargo in damaged condition.

Bangladesh also contends that "Mobil's cargo of lubricating oil was not perishable and was not endangered, in any way, by

**40.** *Id.* at 83–84.

**41.** *Id.* at 83–85.

**42.** *See Spartus Corp. v. S/S Yafo,* 590 F.2d 1310, 1313 (5th Cir.1979) (quoting *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt A.G.,* 28 F.2d 249, 251 (3rd Cir.1928)).

Mobil argues that even if the Banglar Kakoli were authorized to go to London it failed to take the direct and customary route from Philadelphia to London, and thereby deviated from *that* voyage. To support this claim, Mobil relies on the decision in *S.S. Willdomino v. Citro Chem. Co.,* 272 U.S. 718, 727, 47 S.Ct. 261, 262, 71 L.Ed.

491 (1927), to the effect that even if a carrier has the right to elect between two ports in deciding upon the next port of call, it must minimize the risk to cargo by making that election prior to breaking ground. Because of the disposition, *infra,* it is not necessary to consider this further ground for recovery.

**43.** 46 U.S.C. § 1304(4) (1982).

**44.** *See General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 86 (2d Cir.1983) (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 3–40, at 179 (2d ed. 1975)).

the London call en route to Jeddah."[45] Insofar as Bangladesh means to assert that Mobil's cargo was not subject to a greater risk by virtue of the deviation, this argument is entirely without factual support. As noted, the deviation from a direct route to the Mediterranean added at least 1,648 nautical miles to a transatlantic voyage in November and December, when the North Atlantic is hardly calm. The implicit assumption of Bangladesh's argument—that during these additional 1,648 nautical miles the Mobil cargo was subject to no risk of loss whatsoever—is without substance. The deviation from the agreed course increased substantially the risk to cargo.[46] Given that Bangladesh has come forward with no evidence to overcome the presumption of § 4(4) of COGSA, the conclusion is compelled that it unreasonably deviated when the Banglar Kakoli turned to London on about November 26, 1980.

### C. The Consequences of Deviation

■ Given this finding, the Court now turns to the consequences of such a deviation. An unreasonable deviation is a fundamental breach of the contract of carriage; by engaging in such a deviation, the vessel "ousts" the contract of carriage and the provisions limiting the carrier's liability incorporated therein, thereby rendering the carrier an "insurer" of the cargo.[47] An unreasonable deviation also forecloses the carrier's assertion of COGSA's statutory limitations of liability.[48] Bangladesh, to avoid the consequences of its unreasonable deviation, asserts (1) it is not liable for damage that was not proximately caused by the deviation; (2) the burden of proof on causation is upon the shipper, Mobil; and (3) there is no affirmative evidence that damage occurred by reason of the deviation, and in fact, the evidence shows that all damage was proximately caused by events occurring before the vessel turned to London. Mobil, in response, argues (1) that, if there is any requirement that the damage be proximately caused by the deviation, the burden is upon Bangladesh to show the absence of such a causal link; (2) Bangladesh cannot show that all damage that occurred was proximately caused by the predeviation events; and (3) because Bangladesh cannot show which damage was caused by the predeviation storm and which by the deviation, Bangladesh is liable for the whole of the damage, just as if it were all caused by the deviation.

■ i. *Applicable Law*—Addressing the issue of proximate cause and burden of proof in connection with a deviation claim, Judge Friendly, in *Hellenic Lines, Ltd. v. United States,*[49] noted that whether the deviation must have "some casual connection" to the alleged damage remains, under COSGA, an "open" issue.[50] The Court of Appeals ruled, however, that at most the issue of "causal relation" was a "defense" to a charge of absolute insurer's liability and that "the burden of proving this is on the deviator."[51] This holding has substan-

---

**45.** Bangladesh Post-Trial Brief at 33.

**46.** *See General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 [F.2d 80, 86 (2d Cir.1983) ("[A] deviation is unreasonable, thereby breaching the contract of carriage, when in the absence of significant countervailing factors, the deviation substantially increases the exposure of cargo to foreseeable dangers that would have been avoided had no deviation occurred.").

**47.** *See Italia Di Navigazione, S.p.A. v. M.V. Hermes I,* 724 F.2d 21, 22 (2d Cir.1983); *General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 86–87 (2d Cir.1983); *Jones v. The Flying Clipper,* 116 F.Supp. 386, 388–90 (S.D.N.Y.1953).

**48.** *See General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 87 (2d Cir.1983); *Du Pont de Nemours Int'l S.A. v. S.S. Mormacvega,*

493 F.2d 97, 100 & n. 9 (2d Cir.1974); *Jones v. The Flying Clipper,* 116 F.Supp. 386, 389–91 (S.D.N.Y.1953).

**49.** 512 F.2d 1196 (2d Cir.1975).

**50.** *Id.* at 1209–10. *Hellenic Lines* involved damage incurred subsequent to the onset of the deviation, and Judge Friendly therefore did not have occasion to address the precise issue here, which involves a claim that predeviation events were responsible for cargo damage. In light of the disposition, *infra,* however, it is unnecessary to evaluate this distinction.

**51.** 512 F.2d at 1210.

tial support in the law and there is no reason not to apply it to the instant facts.[52]

▮ Thus, if Bangladesh sustains its burden as to the entire damaged cargo, then it is exonerated from liability. If it fails as to all, but carries its burden with respect to some undetermined part of the damage, according to traditional admiralty rules it must also show "how much of the damage arose from th[e non-deviation events]."[53] Subject to equitable principles,[54] if the carrier fails to show what damage is not attributable to the deviation, the entire loss is deemed caused by the fundamental breach, the deviation.[55] Against this background of applicable law, we turn to the proof.

▮ ii. *Proximate Causation*—In contending that the evidence establishes that all damage to the Mobil cargo was proximately caused by predeviation events, Bangladesh relies on three critical facts relating to the portion of the voyage occurring between November 22 and November 26, 1980: (1) the heavy weather recorded on November 22, through November 25; (2) an acute jump in the readings for the No. 1 and No. 4 bilges on November 25; and (3) the deck log entry indicating a change in course to Felixstowe, England, on November 26. The relationship of these three

facts to the ultimate issue here merits close scrutiny.

The Banglar Kakoli has ten bilge tanks, two each, port and starboard, under the four cargo areas and two under the engine room and crew's quarters. Water and other liquids in the upper tween decks and lower holds flow into the bilge tanks directly below through a series of drains, or scuppers, and pipes in the aft of each compartment. Each day the ship's crew ascertains the level of fluid in the bilges by inserting a sounding rod through a pipe located on the main deck. Readings higher than 60 centimeters indicate that fluid in the bilge compartments is overflowing into the lower holds. It is the duty of the ship's engineering crew to pump the bilges to ensure that such overflowing does not occur.

The ship's records indicate that on November 25, 1980, the reading for the No. 1 starboard bilge tank increased from seven to 145 centimeters, while that for the No. 4 starboard tank rose from one to 79 centimeters. Bangladesh asserts that this jump indicates Mobil oil had leaked from broken cans in the No. 1 and No. 4 tween decks sometime prior to the taking of the readings, and had entered the bilge tanks, a conclusion Bangladesh argues is supported by readings from other bilge tanks all below 60 centimeters on November 25. Ban-

---

**52.** *See Calmaquip Eng'g West Hemisphere Corp. v. West Coast Carriers Ltd.,* 650 F.2d 633, 640 (5th Cir. Unit B 1981); *The Hermosa,* 57 F.2d 20, 27 (9th Cir.1932). Decisions under the common law suggest, although they do not compel, the conclusion that some causal relation to the deviation is required. *See, e.g., St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial do Rio de Janeiro,* 263 U.S. 119, 124, 44 S.Ct. 30, 31, 68 L.Ed. 201 (1923) ("[T]he vessel broke her contract, exposed the [goods] to greater risk than had been agreed and thereby *directly caused* the loss" and "accordingly became liable as for a deviation" (emphasis added).); *The St. Paul,* 277 F. 99, 108 (S.D.N.Y.1921) ("*Once the deviation occurs,* it becomes immaterial how the damages are occasioned" (emphasis added).).

**53.** *Armco Int'l Corp. v. Rederi,* 151 F.2d 5, 8 (2d Cir.1945) (L. Hand, J.); *see also id.* ("So far as there is any uncertainty as to the extent of the damage which happened while [the cargo was] on board, the ship has the burden of proof.")

(citing *Schnell v. The Vallescura,* 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934)).

**54.** *See C. Itoh & Co. (America) v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 600 n. 23 (S.D.N.Y.1979) (citing cases).

**55.** Although *Schnell v. The Vallescura,* 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934), did not involve attribution of damage to a deviation, there is no ground for distinguishing between deviation and any other "negligent" conduct to which damages may be attributed in the absence of countervailing proof from the carrier. *Cf. PPG Indus., Inc. v. Ashland Oil Co.,* 592 F.2d 138, 144 (3rd Cir.1978) ("[W]hen the carrier's evidence does not show that the excepted cause produced all of the damage ... the shipper is entitled to a complete explanation."). A deviation is a fundamental breach of the duty owed to cargo, and the rule of *The Vallescura* should thus apply a fortiori to the instant facts.

gladesh attempts to buttress this conclusion with the deposition testimony of the chief officer, who stated that on November 25 he went onto the vessel's main deck, looked through manholes at the No. 1 and No. 4 tween decks with a flashlight and saw that "[t]he cargo was moving and shifting like anything." From the bilge tank readings and the chief officer's testimony, Bangladesh draws the conclusion that all damage to the Mobil consignment was proximately caused during the heavy weather of November 22–25, prior to the ship's turning to England. Bangladesh claims that testimony by Captain Campbell, who surveyed the damage to the Mobil shipment in London, and by Captain Baskerville, who surveyed the consignment at Jeddah and later at Chittagong, lend circumstantial support to this conclusion, since their testimony indicates "there was no appreciable difference in the damage sustained by the Mobil shipment between the time the Banglar Kakoli left London and the time the shipment was discharged ...."[56]

Yet even taking the testimony at face value and resolving all questions of credibility in Bangladesh's favor,[57] Bangladesh's contention that there was no damage that would have been avoided had the Banglar Kakoli proceeded directly to Jeddah instead of deviating a minimum of 1,648 nautical miles and putting in at London for 48 hours is without merit in light of the whole record. The deviation to London added, at a minimum, a week to the voyage.[58] During this time, the Mobil cartons, which were susceptible to damage by oil,[59] were resting in the No. 1 and No. 4 upper tween decks that were, by the testimony of all concerned, and according to Bangladesh's theory of the bilge tank readings,[60] covered with oil that had leaked from the Mobil cans that had been crushed during the November storm. Even assuming that the Mobil cargo was substantially damaged before the vessel turned to London, to claim that the delay occasioned by the deviation caused no aggravation of that damage defies common sense. The testimony of the first officer and Captains Campbell and Baskerville is at best inconclusive. No accurate inventory of damage was made prior to discharge at Chittagong, and there is no fair way to compare the subjective impressions of three individuals who observed the cargo on three separate occasions.

Moreover, the Mobil cargo was further damaged by the action of the ship during

---

**56.** Bangladesh Proposed Findings of Fact: Deviation ¶ 20.

**57.** It should be noted that the witnesses upon whom Bangladesh relies in connection with its claims on proximate causation had reason to favor defendants. Some of these witnesses testified at trial. Others, who testified by deposition, were demonstrably evasive. *See, e.g.,* Tr. 265–66.

**58.** The deck log indicates that the Banglar Kakoli averaged 314 nautical miles per full day of travel from the time it turned to Felixstowe on its way to London and from London to Port Said. *See* Mobil Ex. 45A. Based on this average speed, the vessel consumed at least an additional five days' travel time. Added to this time must be the 48 hours spent loading cargo in London.

**59.** As noted, *supra,* the Mobil cans are coated with polyethelene to retard damage from contact with the lubricating oil stored in them; the cartons in which the cans are packaged are uncoated cardboard. Although, as the Court finds, the can and cardboard arrangement is a proper one for oceangoing transport, the cartons, as the outturn indicated, are susceptible to weakening from prolonged contact with the lubricating oil. Bangladesh conceded that it knew of this danger. *See* Tr. 279–81.

**60.** The Banglar Kakoli's records indicate that the No. 1 starboard bilge tank was at or above overflow level continuously from November 25, 1980, through February 18, 1981. The continued high readings, which are not clearly explained by the evidence, could indicate (1) the crew's failure to pump the bilges; (2) a malfunction in the bilge pumps or the fluid gauges; or (3) a continuous leakage of oil from the Mobil cargo. Assuming the initial high readings in the No. 1 starboard and other tanks did indicate leaking oil, whatever the explanation for the continued high readings in the No. 1 starboard tank, the fact remains that a substantial amount of Mobil oil from cans crushed during the voyage did not drain through the scuppers, but instead remained in the Nos. 1 and 4 tween decks, where it fouled undamaged portions of the Mobil cargo. *See, e.g.,* Bangladesh Ex. J, at 28–29 ("cartons ... impregnated with lubricating oil").

the storm encountered off Gibralter in December. It is plain that the movement of the vessel during the storm—which was recorded as "pitching heavily and pounding violently"—was almost identical to that recorded during the first storm. It defies common experience that the December storm had no aggravating effect on the damage sustained earlier.[61] By adding at least five days on the high seas to the voyage,[62] Bangladesh added substantially to the risk that the Banglar Kakoli would encounter such winter weather in the North Atlantic.[63] The evidence thus repels Bangladesh's assertion that all damage to cargo accrued as a result of the events prior to the ship's turning to England.[64]

This finding is not controverted by Bangladesh's claims that the damage incurred by the Mobil cargo was, if not the product of the predeviation storm, then the result of acts of government authorities, port custom, or other local conditions, at London and Jeddah. The claim as to London is without substance. Although it may be true that, had Bangladesh restowed the Mobil cargo at London, damage caused by the deviation may have been minimized, Bangladesh assumed the risk of being denied the opportunity to restow when it deviated from the customary voyage.[65] The claim with respect to the actions of the Saudi officials stands on a somewhat different ground, but is still without merit. It cannot be doubted that the carriage of the Mobil cargo to Chittagong from Jeddah added substantially to Mobil's damages. Not only was the cargo subjected to further damage from the oily condition of the

Nos. 1 and 4 upper tween decks, but the overcarriage to Chittagong further diminished the value of the oil shipment because no market for oil in cans existed at Chittagong or within a commercially feasible distance. Yet the evidence failed to show that the damage attributable to the predeviation storm was itself the efficient cause of the legal impediments to unloading the salvageable cargo at Jeddah. Although there was testimony to the effect that Jeddah authorities did not permit the discharge of damaged cargo, it appears from the record that the general rule would, under unspecified conditions, be waived if the consignee agreed to take "direct delivery" of cargo from the vessel into vehicles owned by the consignee. The carrier and cargo interests sought such a waiver, which was denied for unspecified reasons, leaving the record noticeably incomplete on the critical question whether but for the deviation the salvageable portion of the Mobil shipment would have been unloaded at Jeddah.[66] Since the burden of proof on this issue was upon Bangladesh, it must bear the consequences of this gap.

◼ iii. *Attribution of Damage*—Having failed to establish that the entirety of Mobil's loss was caused by the predeviation events, Bangladesh was required, in order to be relieved of insurer's liability for that portion of the damage that did occur as a result of the heavy weather of November 22–25, or was otherwise not attributable to the deviation, to show by the preponderance of the evidence what that damage amounted to.[67] The defendants also failed to carry this additional burden.

---

**61.** The evidence indicated that a significant portion of the Mobil shipment was still intact as of the departure from London, yet was improperly stowed so as to protect against crushing during a storm of the severity of the December storm off Gibralter.

**62.** *See supra* note 58.

**63.** *See General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 87 (2d Cir.1983); *Nemeth v. General S.S. Corp., Ltd.,* 694 F.2d 609, 613 (9th Cir.1982).

**64.** *See The Hermosa,* 57 F.2d 20, 27 (9th Cir. 1932).

**65.** *The Henry W. Cramp,* 20 F.2d 320, 322 (3rd Cir.1927); *The St. Paul,* 277 F. 99, 107–08 (S.D. N.Y.1921).

**66.** Even assuming, moreover, that the overcarriage to Chittagong was caused by the Saudis' response to predeviation events, and that the overcarriage resulted in additional damage to the cargo, Bangladesh still has not shown that *no* damage was proximately caused by the deviation.

**67.** *See* cases cited *supra note* 53.

The principal evidence indicating the scope of damage prior to the vessel's deviation to London was the testimony by the first officer that on November 25 he looked through manholes on the deck with a flashlight and saw the cargo in the Nos. 1 and 4 tween decks "moving and shifting like anything" and that on the same date the bilge readings indicated overflow levels. No member of the vessel's crew inventoried the damage to Mobil's cargo before the change in course to London. Moreover, on November 26, the master of the vessel sent a Marconigram to the owner's New York agent stating that he was "unable to ascertain yet if damage to vessel/cargo[.]" Captain Campbell's report on the condition of the cargo at London,[68] prepared on December 10, 1980, found that all but two of the pallets were "severely" or "heavily" damaged and that the loss of "contents" was "large" and "heavy."[69] These general statements, however, give no objective basis by which to apportion the damage as between predeviation and postdeviation events. At trial, Captain Campbell amplified his report, and stated, on the basis of his recollection and expertise, that at the time he saw the cargo at London, forty to fifty percent of the Mobil Oil could have been salvaged. This after-the-fact estimate is contradicted by the record. As noted above, there can be no doubt that further damage to the Mobil cargo was caused by the addition of a week's time to the voyage and during the storm off Gibraltar. Captain Campbell's estimate of the potential salvage at London is challenged by the reports made by the Bangladesh and cargo interests at Chittagong, indicating that, in fact, forty to fifty percent of the cargo of lubricating oil was discharged intact from the vessel at Chittagong. It should be noted that Captain Campbell was the appointed surveyor for the vessel's interests in London. No surveyor representing cargo interests was present, a circumstance wholly attributable to Bangladesh's failure to notify the shippers of the stop in London so that they might have appointed their own surveyors or acted otherwise to ensure the representation of cargo interests during a survey of the damage. The evidence presented by Bangladesh does not otherwise provide an accurate basis for apportioning the damage to Mobil's cargo, even though the non-deviation events may have been responsible for some portion of the loss.

iv. *Equitable Considerations*—Under traditional admiralty rules,[70] the foregoing findings require attribution of the entire loss to the deviation, in the absence of equitable factors militating against such a result. Here the equities are overwhelmingly in Mobil's favor. Even assuming there were no unreasonable deviation that proximately caused damage to Mobil's cargo, the evidence of Bangladesh's liability is compelling. Bangladesh did not, on this record, sustain its defense of perils of the sea. First, the evidence indicated that the stow of the Mobil pallets was broken in Philadelphia and heavy cargo was stowed in the center of the hatchway, blocked by the Mobil pallets, and not in the wings, indicia of improper stowage that caused unnecessary force to be applied to the pallets during the voyage.[71] Second, the ab-

68. Bangladesh Ex. H.

69. "[C]ontents" is nowhere defined in the report and could mean either the cans of oil or the oil itself.

70. *See C. Itoh & Co. (America) v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 600 n. 23 (S.D.N.Y.1979) (citing cases).

71. " '[A]bsence of negligence as a concurring cause may be said to enter into the very definition of a sea peril, so that, in order to establish an exception under this clause, the ship would have to establish freedom from negligence.' " *J.*

*Gerber & Co. v. S.S. Sabine Howaldt,* 437 F.2d 580, 588–89 (2d Cir.1971) (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 3–32 (1st ed. 1957)); *see Nissho-Iwai Co. v. M/T Stolt Lion,* 719 F.2d 34, 41 (2d Cir.1983); *Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 330 (2d Cir.1972). The holding in *Lekas & Drivas, Inc. v. Goulandris,* 306 F.2d 426, 432 (2d Cir.1962), is not to the contrary.

Although the carrier's surveyor, Captain Baskerville, concluded that "[t]he damage can ... be solely attributed to the packaging of the cargo ...," Bangladesh Ex. J, at 44, he conceded that, at least in the No. 1 tween deck, "[p]allets of

sence of structural damage to the ship and arrival intact in Jeddah of the cooling towers stowed above deck,[72] showed that, despite the alleged severity of the November storm, the November 22–25 weather was expectable and not a peril of the sea.[73] Nor does the evidence support Bangladesh's claim that the damage accrued by virtue of "neglect, or default of the master ... in the navigation ... of the ship."[74] The master did not " 'fail[ ] ... to make proper use of the information available to him and to make reasonable course corrections ...."[75] The evidence showed that, given the destinations to which he was ordered to take the vessel, he acted reasonably in navigating the vessel. His turn to the south to evade the storm, although in hindsight a mistake, was in reliance on the instructions of a professional navigation service in San Francisco,[76] and entirely reasonable given the pattern of winter storms in the North Atlantic. As for the alleged "restraint of princes" in London, Bangladesh failed to prove the existence of any specific government regulation prohibiting the restowage of the Mobil cargo. The hearsay contentions of defendants' witnesses that labor would not accept employment to restow the pallets are without force and, in any event, do not establish that there was a restraint of princes.[77] Rather, Bangladesh's course of conduct during the stopover in London, including its failure even to notify Mobil of the "severe" and "heavy" damage to its cargo, indicates a wanton and wilfill disregard for the interests of cargo. Bangladesh simply did not want to undergo the expense of restowing the cargo at London and as much as conceded that this economic factor accounted in part for its non-action.[78] Having committed the foregoing breaches of duty, however, Bangladesh nevertheless seeks to lay the cause of its failure to deliver Mobil's cargo at the door of the Saudi officials who purportedly refused to permit the oil to be landed in its damaged condition because of local port customs and regulations. This Bangladesh may not do. Such a restraint was entirely "foreseeable" and under such circumstances COGSA does not "excuse the owner from the obligations of his duty as a common carrier."[79] Upon this record, the Court finds that Bangladesh failed to overcome Mobil's prima facie case and that the damage to Mobil's cargo was fully attributable to Bangladesh's

[l]ubricating [o]il had been stowed inboard of the after half length and these had been crushed by overstowing cargo which had shifted," *id.* app. I, at 2. Baskerville's conclusion that "the damage started with the partial collapse of one or more pallets of lubricating oil, probably adjacent to the ship[']s side," *id.* at 43, does not prove that the stowage was proper under the circumstances. To the contrary, the evidence indicated that Bangladesh either improperly stowed the heavy cargo in the hatch square instead of the wings, or was negligent in stowing the lubricating oil in the same compartment with the heavy cargo. *See* Tr. 1003–06.

72. *See Kane Int'l Corp. v. MV Hellenic Wave,* 468 F.Supp. 1282, 1284–86 (S.D.N.Y.) (citing cases), *aff'd,* 614 F.2d 1287 (2d Cir.1979).

73. *See id.* at 1284.

74. 46 U.S.C. § 1304(2)(a) (1982).

75. *California & Hawaiian Sugar Co. v. Columbia S.S. Co.,* 510 F.2d 542, 543 (5th Cir.1975) (per curiam); *see American Smelting & Ref. Co. v. S.S. Irish Spruce,* 548 F.2d 56, 59–60 (2d Cir.), *cert. denied,* 431 U.S. 955, 97 S.Ct. 2678, 53

L.Ed.2d 272 (1977); *In re Grace Line Inc.,* 517 F.2d 404, 406 (2d Cir.1975).

76. *See* Bangladesh Ex. L–11.

77. In any event, as discussed *infra,* the defense of restraint of princes is generally not allowed when the alleged restraint is traceable to the carrier's conduct. *See* cases cited *infra* note 79.

78. *See* Tr. 819. The "restraint of labor" defense, 46 U.S.C. § 1304(2)(j) (1982), is unavailing. The record contains no evidence of a strike or any refusal by labor to restow the cargo on reasonable terms.

79. *Morrisey v. S.S. A. & J. Faith,* 252 F.Supp. 54, 58 (N.D.Ohio 1965); *see Unione Austriaca Di Navigazione v. Leon G. Tujague & Co.,* 231 F. 427 (5th Cir.1916); *New York & Porto Rico S.S. Co. v. Guanica Centrale,* 231 F. 820 (2d Cir. 1916). It is not necessary that the carrier show that it was free from all fault, *see Lekas & Drivas, Inc. v. Goulandris,* 306 F.2d 426, 432 (2d Cir.1962), but rather that it was not responsible for the imposition of the restraint.

breaches of duty, even assuming no deviation had occurred.[80]

## III.

### DAMAGES

■ With the loss attributed to the deviation, Bangladesh may not claim the benefit of COGSA's $500 per package liability provision.[81] Bangladesh is therefore liable for the fair market value of the goods at their port of destination, Jeddah, Saudi Arabia, less any amounts paid over to Mobil from the salvage operations at Chittagong. Although Bangladesh contends that the contract between Mobil and the purchaser in Saudi Arabia, the Arabian Petroleum Supply Corporation, was not an arm's-length arrangement, upon all the evidence the Court concludes that the C.I.F. value of Mobil's shipment, $712,092.87, states the fair value at Jeddah, Saudi Arabia. Mobil's claim that the net salvage received was $69,990.37 is reasonable, except insofar as the cost of a round trip airfare from Chittagong, Bangladesh to Rome, Italy, a cost of litigation, was improperly deducted from the gross salvage. Mobil is entitled to judgment for the difference between the C.I.F. value and the net salvage, less the cost of the airfare, plus interest.

The foregoing and any additional facts as stipulated by the parties in the pre-trial order constitute the Court's findings of fact and conclusions of law.

Submit judgment in accordance with the foregoing.

SO ORDERED.

---

**80.** This is so even if some of the damage occurred at the pier/terminal area at Chittagong. *See Insurance Co. of North America v. S/S "Italica,"* 567 F.Supp. 59, 62 (S.D.N.Y.1983).

Moreover, as with the apportionment of damage as between the deviation and other events, Bangladesh, even assuming it would be exonerated, in the absence of a deviation, from some portion of the liability, has not adduced suffi-

cient evidence indicating the extent of its asserted non-liability. Accordingly, *see* cases cited *supra* note 53, even in the absence of a deviation, Bangladesh would be liable for the whole of the damage to Mobil's cargo, subject to the $500 per package limitation.

**81.** *See* cases cited *supra* note 48.